Good morning, your honors. My name is Terrence Estes Hightower. I am here on behalf of the District Court. We're asking this court to reverse the District Court. I'm going to present just two issues for emphasis. The District Court erred when it did not find a due process interest in the risk levels as to dangerousness. And the District Court erred when it did not find the sex offender registry reporting notification and supervision to be punitive. As to due process issue first, risk levels are not conditions, but they are indicators or predictors that must require an individualized assessment in a hearing. The District Court did rely on Mesa v. Livingston. This court has stated when an individual is convicted of a sex offense, no further process is due before imposing sex offender conditions. However, conditions are those things the registrant must perform or is prohibited from performing. Risk levels are not conditions. Again, they are badges, not unlike sex offender. However, the sex offender is based on convictions. Convictions are based on past offenses that resulted in a conviction. They are retrospective. Risk assessments are prospective. They are based on current and future behaviors, characteristics, likelihood of danger of reoffending. But they're made at the time the sentence is imposed, is that correct? Not risk levels, just the fact that they become sex offenders. The department, rather, the Risk Assessment Review Committee assembles. They have the task of weighing over 85,000 registrants. They look at various factors, some of which could include the conviction record. They could look at a whole data set of documents that under the 62.07 allows them to look at more than just the conviction. But because of so many registrants, you have some that go unreported, likely due to a backlog, but testimony could only flesh that out. But with regard to the amount of information that they're receiving, the risk of error mounts with regard to are they getting this information correct. In fact, we do have registrants, some may have sex assault with two different types of levels. For example, John Doe 10 has a sex assault with a low risk level. John Doe 1 has a sex assault with a moderate. John Doe 64 has an aggravated sexual assault with a low risk level. And John Doe 676 has an aggravated sexual assault with a high. So there's no way to counter the evidence that the Risk Committee is using because it's going unchecked. Part of what's odd about this claim is I think the district court, and I think this is based on the pleadings, thought the classification just stemmed from the conviction. But now it looks like we know that, and the state describes this somewhat in its brief, it's not just the conviction. There's some program that looks at a host of factors. So there's sort of this disconnect between how the district court viewed the case, and I think how it was pled, and what we actually now know is the case. So how do we deal with that? So the one assumption is that the pleading was mispled in that statement when it references the classifications of risk levels are based on convictions. However, the misnomer is around that because the article 62.07 describes what the tasks of the committee is or are. And at that time, it does include convictions, but it's not clear on what else is used. We have experts to even try and delve into that, and there's just this misnomer in understanding of what is all looked at. But the issue here for us is that the risk levels themselves are their own badge of honor or dishonor, if you will, and that they require their own level of review, and it's a label that there was a reference to Connecticut Department of Public Safety versus DOE that did not even reference or go into and delve into the risk levels. It was a bootless exercise. However, in DOE v. Pataki, the Second Circuit in New York did recognize that there is value, there is a due process issue in levels of dangerousness. So much so, in New York, based on the direction of that court, New York instituted a notification process that goes from what is high, moderate, low to no. It's assessed, you can have it assessed every two years because it was prospective review. At the end of the day, just looking at the conviction and saying you're just going to be dangerous for the rest of your life, there's a due process interest in that. But that seems to be a weak, I mean, that's the case where the court says, look, you've got your due process that led to the conviction. But it seems to me it's actually a better case for you if there's all these other factors that you would argue you have a right to be heard on. So if it's just based on the due process at the lower court, there's no evaluation of future dangerousness at all. Most courts, they dispose of the case. They decide whether or not you're going to enter into the penal system or if you're just going to go on to probation. But there's no evaluation. But that stigma alone by itself is something that- But what would process do? If it is just based on the conviction, let's say if you're convicted of X offense, we're going to treat you as a high-level sex offender. And that's what this, what procedure would there be? I mean, what would the procedure do if it's clear you have the conviction? So, but as to future levels of dangerousness, there could be- So part of the risk assessment treatment process is that you are subsequently found or eventually found to be rehabilitated. So if you are in a position where you're no longer a danger, then there is an interest to have that heard before the court, whether it's an examiner or some type of expert that approves that same information. So at the end of the day, if it's a matter of how you were designated at the time of your disposition versus 10, 20, 30 years from now, there should be a process that says you're no longer that person who is in danger of reoffending or hurting the public in any manner. So I believe that having the distinction between sex offender, the label, and risk assessment gives an opportunity for a person to not have to wear that same stigma, that same shame with regard to how they're perceived going forward. Yes, we can't deny that if they have that current conviction, it happened. But it does not necessarily mean that they are forever going to be perceived as a danger. That information is subject to open records request. If it's a high designation, neighbors are sent disclosures and notifications with regard to that, and it could be something that was misinformed. Neighbors do not get any information if you're low risk. So there's an interest separate and apart from just being what you were in the past. Let me move to the issue with regard to the punitive status. We believe the district court erred in its application of the Kennedy versus Mendoza Martinez guideposts, or Kennedy factors I'll refer to them as. When you're looking at the traditional aims of punishment, again, using Mesa v. Livingston, the court held that the registry was itself, in fact, stigmatizing. That is that same stigma that the Smith v. Doe court did not find when it held that the stigma that resulted from the Alaska Megan's Law was really from the dissemination of the record, the criminal conviction. This court in recent years have said, no, separate and apart from the conviction, the registry is stigmatizing. That gives us that non-physical banishment and shame that, again, the Smith court did not get to. I did provide the court with a supplemental authority in Pisaki v. Court of Common Pleas on the issue of restraint. This court looked at an offender's situation and held that the fact that registrants have to appear at a certain time on a certain day. Once they get to their registration day, they cannot leave. They are subject to restraints. Also, with regard to the strength, the issue of the prosecution for non-compliance is truly a disability. If it were not a part of the registry statute, registrants would be free to roam about the country. They are truly under a restraint. There is the public safety aspect with regard to the Kennedy factors. That public safety issue is the same public safety interest that we see in Texas' community supervision laws. Under 42A.053, the court dispenses its justice with regard to whether or not they give court-ordered supervision or court-ordered probation based on the public's interest. Weighing interest in that regard still doesn't negate that the probation laws are, in fact, punitive in criminal intent. In terms of being excessive, it's more of the same. If the root and cause of the due process is the conviction itself, then everything that dispenses out of it is punishment because of that. The probation and the registry are because of the conviction. I just want to touch on what was at stake at the district court. The burden at the district court was to rule upon a motion. The plaintiffs were trying to survive a motion 12B.6. When looking at the burden, the plaintiffs or the appellants pled a short and plain statement of claim, showing that they were entitled to relief. That's Rule 8A.2. In terms of this court's appeal, this court of appeals review, it's de novo accepting all well-pled facts are true, viewing them in light most favorable to the plaintiffs. In the record excerpts from 42 to 70, .42 to .70, the plaintiffs pled vignettes of what they've been experiencing on the registry. Then in record excerpts .89 through .91 and .92, the plaintiffs pled how their factual lives apply to the legal theories and legal challenges as applied as well as facial challenges. Again, in .74 through .87, applied challenges. The court had well-pled facts that instead of applying these well-pled facts in favor of the plaintiffs, the court relied on this court's unpublished opinions. At best, we believe that those unpublished opinions of this court would be persuasive authority. If that's the case, then we believe there are other persuasive authorities also that should be factored in, such as the Dovey-Schneider-Munez cases. It was recently in last year, 2018, in New Jersey. I forget the name of that case just offhand. Your time has expired. Thank you. May it please the court, Rance Craft for the Appellees. The types of challenges that the does are asserting against the Texas Sex Offender Registration Program have been repeatedly rejected by this court, district courts, and Texas state courts. There's nothing new or different about the does' live complaint in this case. I'm not clear exactly when the risk assessment is made. The risk assessment is made when they are discharged from TDCJA custody, so it's when they have to enter the program, whether that's when they're in prison or when they go on parole or probation. Is it based solely on the conviction, the statute of conviction? It is not based solely on the offense. I recognize, as Judge Costa pointed out, that is something that the district court seized upon in their pleadings, that they had pleaded that the risk level was based solely on the offense of conviction. That's not correct, but I think the district court was also relying on the fact that, in response to our argument based on the Meza-Jennings rule, which is that once you're convicted of a sex offense, then no further process is due before sex offender conditions are imposed. That's kind of contrary to our case law regarding conditions of sentencing. In other words, a judge can't, after you've been released from custody, say automatically you're subject to all these supervision requirements for the rest of your life. We wouldn't allow that to happen without a hearing. Well, if you're— You're supposed to know what your sentence is, what the conditions of your release are at the time of your conviction, unless there's some other hearing, it seems to me. That's right, and so in response, they did not argue that this risk level somehow was outside of that Meza-Jennings rule. So have they waived any argument based on the actual risk assessment book, which we had to look up ourselves because you all didn't discuss it? Yeah, our argument is that they have waived it because they did not argue that this is somehow outside of Meza because it is based on something other than the offense of conviction. We did not— That may resolve this case, I mean, with waiver, but it does seem then it's sort of— So then the issue's really still out there, though? If someone who files a complaint says, now I understand how the full risk assessment works? If the argument—if you bypass the waiver point and accept their argument that this is not based solely on the offense of conviction but also on prior conviction records, our position is that the Meza-Jennings rule still applies because the information is still being pulled from prior— That's the only place—this book where you go through and you say, was the victim—have they had strangers and male victims and all this kind of stuff? That's all based on sort of the Texas equivalent of a PSR? That's right, and the argument that's been made is that all this information is taken from their prior records. And so our position is that— Chris Rowe, so we don't know from the name. We have—not that you can tell from the name what gender someone is, but there's no indication at all by the name. So we don't know if it was a male victim. Then you can't assess the male victim point or whatever. That's right. Okay. That's right. But even if—I'll move on. It sounds like the assessment is a lot like what happens—what the Bureau of Prisons does. I mean, someone's sentenced in federal court, but you don't know if they're going to high security or minimum security, and that's nothing to judge. But the Bureau of Prisons runs an assessment risk based on all this different information and determines what level of imprisonment they— It's very much like an actuarial assessment that an insurer performs. So what happens is you look at how old is the person when they're released, what was the nature of the offense, have they been convicted of any other non-sexual violent offenses, was the victim male, was the victim related, was the victim a child, and those are— There's a lot of this stuff about, I don't know, like if you were adopted then your birth parents could be considered strangers and things like— I mean, it just seems very detailed in a way that— I mean, is that in the record? I guess you're saying it has to be in the record to get the point. It's not in the record, Judge Haynes. The statute does not prescribe exactly which risk assessment tool TDCJ uses, and so the one they have decided on currently is called the static 99R. That's the whole point. Apparently, it changes over time. It's post-conviction. When does the defendant have the opportunity to say, Wait a minute, this shouldn't apply to me. You're using invalid criteria. This was not part of my judgment of conviction or my sentence. When does the defendant have an opportunity to object to this? The defendant does not have an opportunity to object to the facts and the application of those facts in that risk assessment. But the reason that was not addressed is that was not part of their complaint. They weren't attacking this particular assessment. They just said it's based solely on the offense of conviction. Well, we now know that's not true, and I'm asking the question. Assuming they had pled it correctly, why is this a real problem? So even if the reliance on these facts and this assessment takes it out of MESA, it's still not a problem in this lawsuit because they haven't alleged a plausible underlying deprivation of interest that could support their procedural due process claim. They pleaded this as a stigma plus claim, and under this Court's precedent they haven't pleaded a plausible stigma or plus. We can write this where you just get ready for the next case, so I'd kind of like to hear your arguments why this is okay. So if we're talking about the risk levels and someone is claiming that the risk levels, they're required to be accorded some due process, the problem is the risk levels don't work the necessary deprivation to bring a procedural due process claim. Well, it can go from register for one year to register for life. Is that right? Well, that's a different question, Chief Judge Owen. And I think there's been some confusion about what these risk levels are for. As far as the length of your registration requirement, that is based solely on the offense of conviction. That would be squarely within the Mesa-Jennings rule that you have already received all the process you were due in the proceedings that led to the conviction on which the duration is based. As for the risk levels, the problem is there's not an underlying stigma or a plus, at least as they've pleaded it here. The stigma under this Court's precedent is that it has to be a concrete, factual misrepresentation of wrongdoing by the plaintiff. And my friend in opposition just said that's not what this is. These are predictors. These are prognostications of risk. Okay, and I didn't quite get the answer to my question, which is, so I'm looking at your 99, and y'all didn't provide it, but it's something we can take judicial notice of. It's out there in the public sphere. And it has this thing about it's possible for someone who the offender had met briefly to become a stranger again. If the offender met the victim but forgot the victim, then they would be a stranger. Okay, where is this in the documentation of the crime, this stuff about forgetting and becoming? I mean, it's very detailed is what I'm saying. It's not just let's look at the crime and was it domestic violence, and interestingly enough, that gets fewer points than if it's stranger violence. This says this long story about meeting and forgetting them and meeting them again. How would you find that out if you're the guy applying this, you're sitting at the desk applying this to John Doe 1? How would you find out if this was somebody they'd met before but forgot? If it's not in the records from the prior conviction, there would not be a basis to find that out. Okay, so in those situations where you can't tell was Chris Rowe a man or a woman, was Chris Rowe a stranger or a family member, then the tie goes to the defendant? I don't know the answer to that question, Judge Haynes. I can find out. So, I mean, in other words, they wouldn't get the extra point if you can't in the records show that this was in fact a stranger or this was in fact a man or whatever? I can't say for certain how that works. If when someone is applying the instrument, the information is not available. This is just not a very good case to assess all this because we really don't have a lot of information. Well, we are at the 12B stage, and so this risk— But what they pled doesn't tell— I mean, we were unaware of this without our own judicial notice, if you will, and so that argues for waiver, I get that, but then that, as has been mentioned, is somewhat dissatisfying given the import of this issue. Well, I understand, but— We address the case we have, obviously. We are here on 12B-6, and they're attacking the statute, not what particular risk assessment tool is used, and so that's not— Well, the statute doesn't say that— I didn't think that you can change a risk assessment tool post-conviction. No, you can't. The risk assessment tool is just something that has to be selected by TDCJ. It's a rolling thing. It can change over time, apparently. Yes, they can choose a different risk assessment tool later. They can do that. But they can't change—if it was 10 years that you have to register, they can't make it 15 because they suddenly decide that domestic violence is a greater risk than stranger violence. Well, that is—the risk assessment doesn't go to that at all. The length of your— That's my question. Right. But another way, regardless of what they learn in the future about recidivism, which seems to be what drives this document, if you have a 10-year registration period, that's it. They can't extend it by the risk assessment. No, it has happened in the past that the statute has been amended to change the registration requirements. The risk assessment can't do it. But, no, because it's not tied to the risk assessment. Maybe we should stop and make clear. This is your risk level. It is public information. It is reported on the registry. But in terms of what you have to do because of the risk level, there's only two things that it affects. One is, as my opponent mentioned, if you're a level 3 risk, then they send postcards to people who are in the vicinity. And then there's a requirement that if you want to live on a college campus, you have to be a risk level of 1, and the college or university has to approve. And then the fact that, so on my monthly credit update, I always get an update on the sex offenders in the neighborhood. That would be all of them, right, based just on the registration requirement. That's right. So level 1 on up, we're going to get that notice. That's right. The risk level is only actually tied to those two things that I just mentioned. The defendant doesn't receive anything showing how their risk assessment worked, whether they got points for stranger victim or anything like that? They do not. They do not. So there's no way to even know if an error was made, let alone challenge the error. No, there isn't. But I think this goes to whether this works in underlying deprivation of a protected interest in the first place. And as I was saying, it doesn't meet stigma because it's just a predictor or prognostication of. But why isn't it more stigmatic for me to find out my next-door neighbor has a high risk of recidivism versus a low risk? It might be stigmatizing in the ordinary sense. It would not be stigmatizing in any constitutionally significant sense because it's not a concrete misrepresentation of fact. They also have not asserted a plausible plus. Remember, the stigma is not enough for due process. You also have to have the plus. And here they've confirmed in their briefing on appeal that the plus they're complaining about is what third parties do in reaction to the registry, not the state, but other people seeing individuals on the registry and denying them employment and housing opportunities. Under this court's decision in Tebow, that is not a plausible plus because it has to be a deprivation by the state, not by third parties. The other argument that they've made in their brief is this idea of the threat of prosecution for violating your reporting requirements, that that is a plus. But if the state bar wouldn't license somebody because they're a level three, then that might be, right? But then that would be an as-applied? It would be as-applied, and yes, that would be by the state. But here what they've pleaded and what they've argued in their brief is— I understand that. They didn't say John Doe I was trying to apply to be an attorney. Right. And the reporting levels are not related. Again, they're based on the offense of conviction. So the threat of felony prosecution for violating your reporting requirements just brings us right back to Maza Jennings because that is based on the underlying offense and not these risk levels. In my remaining time, I do want to address this idea that the statute is punitive in effect, and they really have a steep burden in this regard. First of all, as the Supreme Court said in Smith v. Doe, only the clearest showing can negate the legislature's intent to create a civil regulatory scheme. You have the Smith analysis itself, which largely maps onto the Texas program and was not a close decision. In fact, in this court's decision in United States v. Young, the court said Smith was not even a close call. And then you have all of the courts that have said this program is not punitive in effect, and we list those decisions on pages 39 to 40 of our brief. I just want to focus on the arguments that they've made as to why this case is somehow different and sort of tips the balance to the punitive in effect side of the ledger. First of all, they say that all these decisions we've cited come before the 2017 amendments to the program, but they never even identify what those amendments were, much less explain how they tip the balance. And in fact, those amendments were all very minor. I won't list them all here today. They're found on page 283 of the record, note 3. The features that they are complaining about all date to 2005 or earlier, and the decisions that we cite almost all come after that. They also cite a series of state court decisions and they say these courts have emphasized certain features of the program that make it punitive. I'll just quickly address those. One of these requirements is in-person reporting. And here I would just point out that the 1st, 2nd, 4th, 9th, 10th, and 11th circuits have all said that the requirement of in-person reporting is not a disability or restraint that renders a program punitive. And in fact, in the Young case I just referenced, that was a challenge to federal SORNA, and this court said it would be futile to even try to show that SORNA is punitive in effect and SORNA has an in-person reporting requirement that's very similar to Texas'. The other two, the lack of an individualized assessment. Again, in Smith, the Supreme Court said that it's perfectly acceptable to regulate sex offenders as a class and not provide an individualized assessment of dangerousness. I do want to address quickly the Snyder case that they rely on, where the 6th Circuit found that Michigan's program was punitive in effect. In our judgment, that is distinguishable because the court relied heavily on this requirement that you could not live, work, or loiter within 1,000 feet of a school. There's nothing like that in Texas' program. And also the fact you had to update your information immediately with authorities. Texas doesn't have that either. But don't some cities have that? Those are local ordinances, but that's not part of the program. That's not part of Chapter 6. And those don't rely on the risk assessment either? I'm sorry? Those don't rely on the risk assessment either? They rely just on your conviction? I would have to see the ordinance itself, so I don't know the answer to that. But as to the risk level, since we're talking about those, one of the complaints in Smith was that Alaska's program was insufficiently precise because it just lumped the most serious offenders together with the persons who are not likely to reoffend. And the court said that that imprecision did not make the program, did not break the rational connection to its non-punitive purpose and was not excessive. So the fact that Texas has done one better and roughly quantified the risk makes ours even more precise than the Alaska program. The flip side of that is it's no longer a class treatment of sex offenders. It is an individualized assessment. You're not treating them as a class. You are dividing them into classes. What I understood their argument about individualized assessment to be is that it's not a clinical assessment, that no one is sort of sitting down with you and interviewing you for a few hours. No, but you're looking back in their history for very, very specific facts and histories pertaining to that defendant, not all people that are convicted of X, Y, or Z. It is individualized in that respect. That's correct, Chief Judge Owen. But the purpose and primary effect of that is to inform the public for their safety, and that makes it not punitive under Smith. If there are no further questions, we'd ask the Court to affirm the judgment of the District Court. Your Honors, with regard to the Smith's review of risk assessments, with the Court's permission, I'll provide a supplemental authority, but the State of Alaska this year just recently held that there was a due process interest lacking in not having individualized hearings with regard to risk levels. But with regard to the way our pleadings were pled with regard to requests for individualized hearings, we did both non-stigma and stigma plus. So I'm sure the courts will, as they take judicial notice of the pleadings. And with regard to the specificity of the breakdown of the amendments, the registry in our pleadings started with a historical reference of factual allegations as to how the statute was regarded for September 1991 and how it was amended in 1999. Those are our key amendments that we do actually plead with regard to amendment history. And I ask again that the Court just take judicial notice of the pleadings. And that's all I have. I submit. Thank you, Kelly. Thank you.